We have four argued cases this morning. Three of them are related and raise a common appealability issue. And the panelists decided we do not want to have the appealability issue argued in 1945 and 1946, but only in 1944. And the consequence of that, we hope, is that the argument on the later two cases, which will address only the merits, can perhaps be briefer and you won't find it necessary to use your entire time. Also, with respect to the appellants, you have the wrong appendix materials in the blue brief with respect to 1945. And you should be careful about that because it's quite inconvenient to us to take a brief home and find that we have the wrong appendix material in there. And then, finally, with respect to the red brief, there seem to be confidentiality markings there which are difficult to justify. They're really confidentiality markings about a legal argument that's being made about facts which are disclosed elsewhere, and that's not appropriate. And that's true of all three of the red briefs. Why don't we hear our first case, which is 15-1944, Y51, LLC, versus Broadcom Corporation, Mr. Cawley.  May it please the Court, we're here, as Your Honor has alluded to, on three related appeals from the Patent Trial and Appeal Board, finding three separate patents invalid after final determination. These appeals raise first an issue of reviewability of the Board's determination under 315B that there is not a time bar to the proceedings. In addition to the reviewability, we believe that there is raised a question of evidence, whether the evidence before the Board justifies this Court in determining not only is that issue reviewable, but that the evidence shows that, in fact, the claims are time barred, and in the alternative, that if the evidence is not sufficient at this point, that each of the proceedings should be remanded to the Board for appropriate discovery to enable the Board, and ultimately this Court, to determine those facts. Then, of course, the Court may choose to proceed on to the merits of the determinations of invalidity, and as Your Honor has directed, we'll be prepared to discuss that in subsequent arguments. Of course, as the Court is well aware, the decision of the reviewability of the time bar under 315B is impacted by the Supreme Court's recent decision in Cuozo. As the Court knows in that case, the Court observed, first of all, that there is a powerful and strong presumption of reviewability of agencies' actions by an Article III court. In order to overcome that presumption, the Supreme Court reminded us that there must be clear and convincing, that's the Supreme Court's language, clear and convincing indication of Congressional intent to curb judicial review. Obviously, that indication exists in Section 314 of the America Invents Act. We do have precedent that's almost squarely on point on this particular issue, so why don't you try to distinguish it? Why should we not follow, I mean, we can't, we need to, we're going to have to follow our precedent. Well, what makes your argument different here? Your Honor is referring, of course, to the Caddy's decision of 10 months ago. What is different is that we now have direction from the Supreme Court that tells us that that decision was wrongfully decided. How does it do that? Because it, the Supreme Court in Cuozo, tells us that in order to extend the bar on appellate review found in 314D, outside of that section, it must be closely tied to the decision of institution. In the first place, as Justice Breyer went to some pains in Cuozo to explain to us things that would not be barred from review. The first was constitutional questions. But the second matter that the court explained to us would not be barred from review would be violations of statutes whose scope extends beyond this section, 314. The decision of the application of the time bar of 315B extends beyond the decision to institute. As the board has recognized, it is a fact-intensive inquiry, and it frequently merits development and decision based on the facts adduced at the trial stage. That fits precisely within Judge Breyer's admonition that violation of a statute that extends beyond the prohibition of appeal of 314D is subject to judicial review. There is another more fundamental reason. The Supreme Court in Cuozo... So in this case, what's the extension of scope that you're arguing? That patentability issues or institution issues are restricted to patent law, to patentability, to 102, 103, 112, as opposed to an issue such as this that we're looking at, real party and interest, and that extends to law in general. It's just limited to patent law. Yes, Your Honor. The Supreme Court went to some pains to explain the congressional rationale for limiting review of institution decisions. And they were basically that the experts in the PTO should be entitled to exercise their expertise as experts in patent law and as experts in technology in making the decision whether or not to institute review of their own work. Those considerations, though, do not apply to the legal issues presented by the time bar of 315B. That involves an inquiry into whether or not there is privity of interest or whether or not there are parties in interest, in this case, by the petitioner Broadcom and the Texas defendants who were time barred. Those issues have nothing to do with patent law. They have nothing to do with technology. It didn't even say if it had anything to do with patent law. So it was a question of whether you had to have raised the issue in the petition in the first place. It wasn't an issue related to substantive patent law. In fact, Cuozo suggests that if you're dealing with issues of substantive patent law, for example, whether they could rely on a 112 analysis and an IPR, Justice Breyer's opinion suggests that that's not appropriate, that you can't go for a substantive ground of rejection that's beyond 102 and 103. He did suggest that, Your Honor. But with respect, it did involve a question of patent law in Cuozo. Cuozo involved the issue under 112A3 of whether the petition identified the claims at issue with sufficient particularity. The Supreme Court went out of its way to explain that decision involves issues of patent law, namely the dependency relationship between a dependent claim and another dependent claim that it depends on and ultimately an independent claim. That was an issue of patent law. It also involves issues of technology to determine the extent of the overlap between the single claim identified in the petition and the two additional claims that the board found satisfied 112. So that exactly was an issue of patent law. And the Supreme Court went out of its way to explain that it was within the expertise of the board to make that kind of mind-run decision. When we read this petition, with our knowledge of patent law and our knowledge of technology, does it fairly identify additional claims that should be subject to review? Contrast that, Your Honor, with the decision facing the board under 315B, the time bar. There's no issue of patent law there. There's no issue of technology there. It's strictly a legal question. Are they a party in interest? And are they a privy? Your Honor referred to the Achates decision. Achates. Sorry? I think it's pronounced Achates. Achates. Well, I'll certainly adopt Your Honor's pronunciation. The Achates decision, in that decision, although the court did find that the time bar decision was unreviewable without the benefit of the guidance of Cuozzo, the court in Achates specifically found that the time bar decision does not relate to an issue of patentability. It was described as simply a rule of procedure, something that identifies the class of people that are and are not entitled to file a petition for review. That's exactly what puts this squarely within Justice Breyer's description of a statute whose scope extends beyond the reviewability prohibition of 314B. Could I get you to turn to Cling 15 of the patent? I understand your argument about the textual language of what we're calling A, B, and C, the three components that are in dispute here and the connection between B and C. But as a practical matter, my question is how could you have a system that works in which it uses the erroneous sequence number length field without an erroneous sequence number field, which is what your construction, as I understand it, would require? The erroneous sequence number field, Your Honor? Your construction, as I understand it, would require that the erroneous sequence number length field could stand alone without the erroneous sequence number field, which is the construction that you give to the last clause after we go through length, erroneous sequence number, and erroneous sequence number field, and then each of said erroneous sequence number field, et cetera. How can that work? Because I can understand how you could have an erroneous sequence number field without an erroneous sequence number length field because you could just have a first-last system or you could just denominate each of the missing packets. But the length field, it seems to me, without the erroneous sequence number field would be untied to anything. I don't see how that works as a practical matter. In terms of how it works from the perspective of a computer scientist, and I'm not a computer scientist. I don't mean to say that. I'm sure you're prepared to. Our point, Your Honor, is not how it works or even whether it works, because that wasn't a ground of invalidity and couldn't properly be before the board, but that Claim 15 requires a length field. Yes, yes. But what I'm really asking is not a validity question whether it works, but a question of whether it's sensible to read the claim as you propose if the claim doesn't make any sense if it's read that way. So if you can explain to me how it makes sense to have an erroneous sequence number length field without an erroneous sequence number field, that would put my mind at ease. Okay. I think that those two types of error can be viewed as independent. One is not necessarily dependent on the other. One can be erroneous. They both can be erroneous. But, again, the legal issue is does the Claim 15 require a length field? Yes, that's the ultimate issue. But in order to get there, you have to persuade us that you can't have an erroneous sequence number field without an erroneous sequence number length field. And if the claim is properly construed to mean you could have an erroneous sequence number field without an erroneous sequence number length field, then the claim doesn't require a length field. Do you agree with that proposition? Well, I think that it does by its explicit terms. I understand. That's why I think you may be right about the technical, better technical reading of the language. But my question, then, is why should we read the language that way if it makes no sense? As a practical matter, you couldn't have a system operate that had only the erroneous sequence number length field and without the erroneous sequence number field. I think that the best I can say in response to that, Your Honor, is that that's an interesting argument and an interesting observation and an interesting issue, but that it is, at the end of the day, not pertinent to the question of whether the claim contains that language and whether SAO, the allegedly invalidating reference, discloses a length field. That was the basis of the Board's decision, and that was error. So if you look at Figure 10 here, just so that I understand the terminology, there's a reference there that L1 says 3. That's the number sequence length field? The L? Figure 10, Your Honor? Yes, Your Honor. L1. L1. Not length, but L1. Length is just the length field as opposed to the sequence number, erroneous sequence number length field. I think that's right, Your Honor. Yeah. And SN? That's what L1 is. And SN is the erroneous sequence number. Sequence number. Right. Okay. All right. Thank you, Your Honor. We'll give you two minutes for rebuttal. Mr. Matheson? May it please the Court, I'll start where Your Honor's finished with Claim 15. It does not make any sense for there to be an erroneous sequence number length field without an erroneous sequence number field. And if you read Claim 15, in light of the specification of which it is part, the interpretation of the Board is correct. If you look at the figures on page A31, there is a little bit of strange labeling. The figure that Your Honor, Judge Dyke, was referring to is actually labeled figure 11. It's labeled at the bottom of the figure rather than the top. I see. But if we look at those two figures together, figure 10, which refers to the chart above it, and figure 11, we can see a situation in figure 10 in which there is SN1, SN2, et cetera. Those are the erroneous sequence number fields. It's clear in figure 10 that you can have an erroneous sequence number field without always having an associated erroneous sequence number length field, which is why Claim 15 is written as a choice... Because there's a zero after L2, Your Honor? I'm sorry, Your Honor? Because there's a zero after L2? So for figure 11, the L2 is just identifying the length of the erroneous sequence number field. Does that mean that 101 is the only error, that the length isn't greater than 101? I mean, it doesn't include 102 and 103, for example. That's correct. When you have an erroneous sequence number, you can then have a length field, which describes a span of erroneous sequence numbers following that. But if the length is zero, there's just that one. So what you're saying, if I understand it, is that figure 10, the chart that's above the designation for figure 10, is a demonstration of a case in which there's an erroneous sequence number field without an erroneous sequence number length field. That's correct. And figure 11 is a demonstration of the erroneous sequence number field with an erroneous sequence number length field. That's correct, Your Honor. And contrary to what Wi-Fi One is arguing, there is no example in the patent of an erroneous sequence number length field without a corresponding erroneous sequence number field. It's hard for me to see how that would make sense. Why would you ever have the length if you haven't got the first erroneous packet? I agree, Your Honor. And the question was, you know, how is this described? It's being raised now as an issue of claim construction. But there was sufficient evidence in the record from the declarations of the experts. The Patent Office considered this. But really the issue is reading the patents, reading Claim 15 in light of the specification. But here's where I don't follow your argument, and that is where you say that the language itself of Claim 15 supports you. I understand the argument about the way the specification seems to make the language as read by the appellants not make sense. I understand that argument. But I don't understand how you can say that conclusively that the language of the claim actually reads on a system in which there's no length field. And the reason, let's take the claim language. In fact, if you can bear with trying to boil it down, let's say instead of the A and B and C, there's a confusing set of words. But let's just call it Argentinians, Bolivians, and Colombians. And then instead of associated with, let's say married. And it seems to me if you read the language of the claim, what you've got is Argentinians, Brazilians, and Colombians. Each of the Brazilians, that's the second category, is married to a Colombian. And that means that all Brazilians in your group are married to Colombians. But it doesn't mean that all Colombians, the last group, are married to Brazilians. So you've got it flipped the other way. Why is my South American analogy wrong? You follow me, I think. I do follow you, Your Honor. And I agree it's not the most artfully drafted claim. But you do need to look at the claim and look at the specification. I know. I know. But I do make the argument that the claim itself, the language is clear, that it reads the other way from my Brazilians. I don't get it. So let's parse it this way. The phrase is preceded by at least one. So you have a situation where there's at least one of an Argentinian, at least one of a Brazilian, at least one of a Colombian. Right. And when there is a Colombian, that Colombian is associated with a Brazilian. Wait, wait, wait, wait. It says, each of said plurality of erroneous sequence number fields, those are the Brazilians. Right? Remember, that's B. Those are the Brazilians, are associated with respective one of said plurality of erroneous sequence number length fields. Those are the Colombians. So all Brazilians are married to a Colombian, but not all Colombians are married to a Brazilian. That's my reading. And why is that wrong? It's incorrect because you read the three-part A, B, and C as a phrase, which was preceded by at least one of. And so when you get to the end, and you have the and, and the plurality of erroneous sequence number length fields, and the plurality of Colombians, each of said Brazilians associated with the respective one of said Colombians. It's only when you have a Colombian, you then have each length field associated, each Brazilian associated with the Colombian. In the terms of A, B, and C, it could have been written at least one of A or B and B and C. Granted, that would have been clear. That's what the specification shows. Wherever you have a C, it's always associated with a B. The C never exists apart of itself. Okay. Well, I won't pester you any further on this, so you might want to turn to it. Yeah. Or maybe somebody else wants to pester you. Put aside the Brazilians and the Colombians. It seems to me that the argument here is that this claim requires the expression of the errors by stating a range. In other words, instead of a first to last, which is the prior art in some respects. So why is that reading wrong? In other words, the sequence number length field tells you what the length of the erroneous sequence is, whether it's 3, 4, 1, 0, whatever. And this is the way this claim is supposed to read. It's by communicating information about the length of the sequence. And rather than doing a list of the erroneous numbers or a first to last expression, why isn't that an appropriate reading of this claim? The way the claim is written with the requirement that there's only at least one of these fields required, it covers the bitmap situation. So if you had at least one of a length, not the erroneous number. Well, that's really the issue, isn't it? Whether it covers both the bitmap and list situation. Yes, sir. It is drafted to cover those situations described in claims. It's not limited. And because it uses at least one of length, end of story, that claim is met if it only has a length field. Not if it ever has an erroneous sequence number field. But if you read it to say that there has to be a sequence number length field for each erroneous sequence number field, you'd be saying, essentially, that this is dealing with the expression of a range in which the first number is expressed. And you're told by the sequence number length field how long the string is, right? And that is one of the three options. So written in terms of at least one of, you can have the option where you're doing a bitmap, and all you have in that situation is the length of the bitmap. The second situation where you're only identifying one erroneous sequence number or you're identifying each. So that's basically the issue here is whether this is confined to the expression in terms of a range or whether it includes the other alternatives. Is that a fair statement? Correct, Your Honor. And if you look at the charts that we were just looking at, figure 10 and figure 11, figure 10 is the chart where you have just the sequence numbers listed. No length fields for erroneous sequence numbers. So you're identifying each and every erroneous sequence number. But how do we know that figure 10 is within this claim? Excuse me? How do we know that figure 10 is within this claim? There's no indication that they intended to exclude figure 10 from this claim. And they did it by virtue of the at least one of construction. They said you can have at least one of the length, which includes the bitmap, no identification of erroneous sequence numbers. The second option was figure 10, which lists just the sequence numbers. So if 1, 3, 5, and 6 were erroneous, you'd have to say 1, 3, 5, and 6. The third option is associated with an erroneous sequence number with an erroneous sequence number length field. If 1, 3, 5, and 6 were erroneous, you could say 1, 3, 5, with a length of 2. All three of those charts, figures 4, 5, and 6, and 9, 10, and 11, are encompassed by those three parts of the claim. Yeah, and I understand that, and that seems to be correct. But my problem is with the each of said language that it's at the end there, which creates our confusion here. I agree it's not the model of clarity, but it does define the antecedent immediately before it. So it is associated with the third option. When you have an erroneous sequence number length field, those erroneous sequence numbers must be associated with an erroneous sequence number length field. It's just saying that you can't have a length field alone, because as Judge Bryson said, that wouldn't tell you enough information. That's right. It's as if it said, you can have at least one of A, B, and C, but we really don't mean you can have C alone. And every time you have C, it must also have a B associated with it. And in the context of the spec, it's clear that that was the intention. If I could address Quozo and Aketi's version, Your Honor. This court's decision in Ashady's, Aketi's, however you pronounce it, is good law. It stands. Nothing in Quozo called it into question. The court in the Supreme Court in Quozo said that their decision applies where the grounds for attacking the decision to institute IPR consist of questions that are closely tied to the application and interpretation of statutes related to the Patent Office's decision to initiate inter-parties review. 315B is, by its very terms, describes when the Patent Office may or may not institute IPR. It literally uses the word institution in Section 315B. You could not hew any more closely to the Supreme Court's holding in which the provision that we're talking about relates to the decision to institute. It is even closer than the very section that the court was looking at in Quozo, which was 312, and 312A, which in that section it was 312A3. And... Well, your argument is that as long as the Patent Office uses the word institution anywhere in a decision that deprives us of reviewability. That issue is not before the court here, Your Honor, and there may be situations... That's your argument, right. A decision to institute is not reviewable, and that's what Quozo said. And you were affirmed by the Supreme Court saying that those decisions are not reviewable. The Supreme Court left open challenges which would be appropriate if there was a constitutional violation or other, quote, shenanigans. For example, if institution was granted on 112 grounds, which by statute are not appropriate grounds to institute IPR, then that's left open. What about the reasoning of Achetes itself, which suggested that if it's a procedural problem with the institution which could have been fixed, then it's not something that can be appealed, which would not include Justice Breyer's example of instituting based on 112. There's no way to fix that. But with respect to the problem that existed in Quozo itself, that is the argument that it wasn't in the petition or the argument in Achetes that it wasn't timely instituted because of the privity, these are things that could have been fixed if a different procedure had been followed. Right. And this case is on all fours with Achetes. There is hardly any distinction. I don't think anybody at this point is really arguing to the contrary, though they did in their brief. And so in Achetes, there was the issue of is it time barred? There was the issue of was there an indemnity agreement? There was the issue of whether there should have been discovery about an indemnity agreement, the same issues we have here. And Achetes says, you know, a proper petition could have been filed. The time bar being within the discretion of the patent office is waiverable. What it's saying is you can't appeal procedural defects like this. That's what Congress intended by the appeal bar. Procedural defects that are closely related to the decision to institute, not reviewable. The ultimate final written decision under 319, reviewable for issues of patentability, which goes to the congressional purpose of restoring faith in the patent system. Thank you, Your Honor. Thank you, Mr. Hoffman. Mr. Crawley, you have two minutes. Thank you, Your Honor. The decision under 315B is not limited to the decision to institute. It occurs more frequently at the trial stage. It must because it requires, in many instances, a development of the facts. In this case, the application for discovery, which was denied, the motion for rehearing, which was denied, the mandamus to this court, which was denied without prejudice to raising the bar after a final determination. All of those happened at the trial stage, not at the institution stage. That is why the bar of 315B falls within what Justice Breyer described as the violation of a statute whose scope extends beyond 314. Briefly on the merits, Your Honor, although we spent quite a bit of time discussing claim 15, there are other reasons why the single reference of SAO does not anticipate the 215 patent. First, the claims require a type identifier field, and SAO has no such field. It has two separate fields for lists and a bitmap. They are always transmitted. Sometimes there's values there, and sometimes there's not, but SAO does not include a type identifier field. And second, the claims require that the type identifier field be in the message field or the payload, and SAO does not disclose a type identifier field in the payload. In summary, Your Honor, we believe that on the merits, the board committed error in finding the patent invalid, but overarching that error, we think that it was clear under the Supreme Court's precedent of Cuozo that the decision on time bar, the existence of privity and party and interest, is reviewable by an Article III court. Why is it that SAO has two types of fields that I see may apply here, the NAK and the NAK type? Why is that not a field identifier field?  It may accomplish the same objective of identifying whether the transmitter is dealing with a bitmap or a list, but it does it in a different way than the claims of the patent describe. You mentioned that the patent requires that the type identifier field appear in the message, not in the header, and I didn't see anything in the patent that does that. I missed it. Is that in the patent? Figure 8 of the patent shows the message field in the payload is a single patent including multiple message fields. Yeah. But nothing in the claim. Not in the claim. Right. It's not in the claim, but the claim as informed by the specification show that it is in the message field. Okay. Okay. Thank you, Mr. Long. Thank you. Let's move on to our second case, which is number 15-1945, Y5-1 LLC v. Broadcom, and I'll call you again. Thank you, Your Honor. I'll observe the Court's admonition to be brief. If we're through with the discussion of CUOSO and its implications, then on the merits, the Patent Trial Appeal Board erred in finding that two references, Morley and Adams. But this boils down to the transmission characteristic question. So why does the claim require a transmission characteristic as well as part of a service type identifier? The way I read the specification, it distinguishes between those two things. In 927-32, the specification refers to a field that serves the purpose of a service type identifier. Regarding the type of service, which the Associated paid over, I'm sorry, Column 9, lines 27-32. Oh, this is the one I have. Wrong. It ended. 27, yeah, okay. Thus, according to another exemplary embodiment of the present invention, the FOC fields may also serve the purpose of service type identifier. In this embodiment, the FOC can provide information regarding the type of service, which the Associated payload is currently supporting, the channel coding and or interleaving associated therewith. Yeah, but that's exactly my point, because it distinguishes between the type of service and the channel coding, which is a transmission characteristic. It's not saying that channel coding is part of type of service. Well, it includes channel coding as one of the things that is transmitted in connection with a service type identifier. Well, so what? That doesn't make it part of the service type identifier. Well, I think a fair reading of that portion of the specification suggests that it does, Your Honor. What do you do with the and or, in particular the or? Seems to me it provides three different possibilities, right? So it could have type, doesn't need to have channel coding or interleaving. Well, the question really is, is this present in Morley or Adams? Type. And it's not. If all that's required is type and channel coding and interleaving are not required, you say that Morley and Adams still do not? Yes. Yes, Your Honor. That was the PTAB's construction, is the PTAB rejected our position that the transmission characteristics form a part of service type identifier. But even under those circumstances, neither Morley nor Adams anticipate. Morley does not because it does not disclose an identifier that identifies the type of information. Instead, it disclosed a frame type that identifies the format of the packet. Morley related to a receiver that would determine the format of the packet to determine whether that packet contained voice or data. And then the device disclosed in Morley was hardwired to send the relevant data or voice to an appropriate hardwired decoder. It is true that Morley had as one of its objects the identification by the receiver of the type of transmission. But it's not true that it did it in the way the patent describes because it didn't disclose an identifier that identifies the type of information. What do you do with column three, line 14 through 17, in which it appears that the specification is defining a service type identifier as something that informs the mobile or base station of the type of information, e.g. voice, video, or data being conveyed? Well, it does that. And it may be that both Morley and Adams do that, too. But the question is, do they do it in the way that is prescribed by the claims? We'll take Adams as an example. There, Adams discloses different types of packets that may be utilized for different types of content, voice, data, video, etc. And the receiver in Adams identifies the type of packet that satisfies that portion and accomplishes the desired goal of the portion of the specification that Your Honor is referring to. But it does it in a different way. It doesn't have an identifier that identifies the type of information. It identifies the type of packet. Well, but it identifies the packet as being voice, video, or data, right? The packet, yes. And it isn't? It identifies the packet as being of a certain type. And the type of packet includes, among other characteristics, the content of the data as voice, video, or data. So I agree with Your Honor that Adams discloses a way of identifying that information to the receiver. But the key to that first statement is a way, not the only way, and not the way that is disclosed in the patent. All right. Thank you, Your Honor. Any further? All right. Thank you. Mr. Goldman? May it please the Court, Kevin Goldman on behalf of Broadcom. There are three main issues I'd like to address. First, the Board's construction of service type identifier is correct. The claims, the specification, and the prosecution history all say the same thing. The service type identifier identifies the type of information being conveyed in the message. The intrinsic evidence draws a clear distinction between that and the transmission characteristics of the message. Second, there's substantial evidence that Morley discloses a service type identifier. The signal header tells the receiver what type of information is in the payload. That's what Morley says in plain English, and our expert confirmed it. Finally, there's substantial evidence that Adams discloses a service type identifier. Again, the header tells the receiver what type of information is in the payload. Again, it's in plain English, and our expert confirmed it. Listening to Wi-Fi One's argument today, there is simply no daylight between what you see in Morley and Adams and what's disclosed in the patent. Now, Wi-Fi argues that that's really not enough to read on the patent claim. That the patent claim, even if you accept all that is true, you still don't get to the patent claim. You've heard the argument this morning. I'm not sure I paraphrased Mr. Cawley accurately or completely accurately, but what's your response? The suggestion that the format of the frame is somehow different from identifying the type of information in the payload is a distinction without a difference. From the perspective of the receiver, that there simply is no difference. The header tells the receiver what are the contents of the frame, whether it's voice or data or video or whatever the associated content may be. What the receiver does with that is it then puts the video data in the video queue, the voice data in the voice queue, the associated data in the associated queue. That is identifying the contents of the payload. That's exactly what's described in the 568 patent in column three. When the receiver knows the type of information in the payload, it then knows how to process it. And when you call it an identification of the frame or the format or the identity of the payload, it's all the same thing. Because it is a signal that tells the receiver how do you process this based on what type of information it is. And again, the board's construction is correct. You can see the claim language itself, which refers to the service type identifier identifying the type of information in the payload. And the specification says that time and again. And further, this is confirmed by the prosecution history. Applicants specifically distinguished the Fire Art Wraith reference on the grounds that it disclosed a field that had channel coding and not the type of information in the payload. And Judge Bryson, you mentioned the and or phrase in column nine. And that was significant. It indicates that the service type identifier can tell you just the type of information in the payload, not transmission characteristics. And in the prosecution history, the applicants relied on that specific passage to obtain the patent. They specifically said that the and or passage shows that each one of those is an independent alternative. That's page 1279 in the prosecution history. It confirms that just conveying that type of information alone is enough to satisfy the requirement of a service type identifier. That's what the board found. That's what's present in Morley and in Adams. The court doesn't have any further questions.  Thank you, Mr. Cole. Thank you, Your Honor. Mr. Cole, anything more? Thank you. Just briefly, Your Honor. The invention allows the transmitter to use a single format to identify all three types of data. That is in contrast with Morley, which discloses a frame type that identifies the format of the packet. Now, the specification doesn't really tell us why one way of doing that is better than another. We might imagine that Morley requires more overhead. But the fact of the matter is the inquiry is not do both of these patents disclose a way of allowing a transmitter to identify the type of data being transmitted. That would be a hopelessly broad claim. Instead, the claims of this patent are specifically crafted to require an identifier that identifies the type of information. Morley does not do that. Adams does not do that. And for that reason, the board erred in finding anticipation.